**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IRIS GILLON and IRIS GILLON MUSIC'N CELEBRATIONS, LCC d/b/a IGMC,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**HONEY BERNSTEIN,**<br><br>**Defendant.** | Civ. No. 2:12-4891 (WJM)<br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiffs Iris Gillon and Iris Gillon Music'N Celebrations, LLC bring this action against Defendant Honey Bernstein, alleging seven common law counts, including libel, product disparagement and false light. This matter comes before the Court on Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. In response, Plaintiffs cross-moved to admit their witness, Shane McMurray, as an expert witness before this Court. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Defendant's motion is **GRANTED** in its entirety. Plaintiffs' cross-motion is **DENIED** and their claims are **DISMISSED**.

I.     **BACKGROUND**

This dispute arises out of a negative online consumer review posted by Defendant Honey Bernstein on August 9, 2011. In her review, Defendant expressed her dissatisfaction with the music planning services provided by Plaintiffs at her son's wedding. Plaintiffs allege that Defendant's review was defamatory because it inaccurately portrayed events that transpired the night of the wedding. Unless otherwise noted, the following facts are undisputed.

A.     Gillon and IMGC

Plaintiffs in this case are Iris Gillon, a resident of Teaneck, New Jersey, and Iris Gillon Music'N Celebrations, LLC ("IGMC"), a New Jersey limited liability company that

1

Gillon owns and operates. Gillon, through IGMC, is a self-described "event planner"[1] who specializes in booking music entertainment for both weddings and corporate events. Statement of Material Facts in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Statement") ¶ 2, ECF No. 51. Gillon operates a number of websites, many of which tout the knowledge, experience, and professionalism of IGMC. *See, e.g.*, *id*. at ¶¶ 4–7.

IGMC promotional materials also indicate that, in connection with her work in the wedding industry, Gillon has appeared on two television programs, "the Apprentice" and "Platinum Wedding." *See id*. at ¶ 3. At least with respect to her appearance on "the Apprentice", however, Gillon was not featured prominently, and she did not promote her event planning business. *See* Pls.' Resp. at ¶ 3. Moreover, while Defendant is correct in stating that there are dozens of websites related to IGMC, Gillon created some of those sites for the sole purpose of diverting internet traffic away from Defendant's negative review.[2] *See* Pls.' Supplemental Statement of Material Facts in Opp'n ("Pls.' Statement") 2–4, ECF No. 58.[3]

The record further shows that, at least with respect to the event planning industry, Plaintiff has never written articles in trade publications, provided insight in seminar settings, or maintained any role in industry associations. *See* Pls.' Statement at ¶¶ 6–13. Plaintiff also does not have any employees who assist her with the business—IGMC therefore operates as a sole proprietorship, and its successes and failures are only felt by Plaintiff. *See* Certification in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Cert."), Ex. Q ¶¶ 2–4, ECF No. 50. As evidenced by tax returns, Gillon and IGMC have experienced inconsistent financial earnings since 2007. Specifically, IGMC reported the following net profit figures between 2007 and 2013: $106,454.00 in 2007; $119,621.00 in 2008; a loss of $56,579.00 in 2009; $73,899.00 in 2010; $21,496.00 in 2011; a loss of $5,181.00 in 2012; and $7,704.00 in 2013. *See* Def.'s Cert., Ex. W.

B.   Defendant's Hiring of IGMC

In the early summer of 2011, Defendant sought to hire a music entertainment company for her son's wedding, which was to be held at her home in Goshen, New York. *See* Def.'s Statement at ¶ 1. According to her testimony, Defendant came across IGMC in the course of her internet research and was impressed with the promotional materials featured on Gillon's website. *See id*. at ¶ 10. The representations on the website inspired Defendant to inquire with Gillon regarding the possibility of using IGMC for the wedding. *See id*. at ¶ 11. After hashing out certain details, the parties entered into a "Music Producer and Purchaser Agreement" (the "Agreement"), which provided that IGMC would produce, supervise, and manage all music entertainment associated with the event. The

---

[1] A jack of all trades, Gillon also represents that she has expertise as a composer, concert pianist, voice-over actress, and author. *See* Pls.' Responsive Statement of Material Facts ("Pls.' Resp.") ¶ 2, ECF No. 58.
[2] This is commonly referred to as a "push down" strategy.
[3] The Court notes that Plaintiff's briefing, including her Statement of Material Facts, is confusing. For this reason, the Court cites to page numbers instead of paragraph numbers when referencing Plaintiff's Statement.

entertainment booked for the wedding included a DJ and a band named "Unanimous." *See id.* at ¶14; Def.'s Cert., Ex. J. The Agreement that provided the following, in pertinent part:

- Total Performance Hours: 1 hr ceremony and arrivals Keys and Flue (to begin no later than 7:45-8:45 pm)
- 4 Hours Full Band w/DJ combo playing for the Reception (8:45 – Ending 12:45 am)
- Music Detail: 5 Musicians Keyboards, Guitar-Vocals, Sax-Vocals, F. Vocal and Congas Trumpet/Vocals and DJ

*See* Def.'s Cert., Ex. J.

On August 4, 2011, two days before the wedding date, Defendant emailed Gillon, inquiring to the proper electrical specifications for the live music. *See* Def.'s Statement at ¶ 18; Def.'s Cert., Ex. I. Gillon responded within an hour, explaining that:

2x 20 amp line is enough for the ceremony

5 x 20 amp lines should do it for band and DJ both.

THAT IS wiring needed for two separate locations.

*See* Def.'s Cert., Ex. I. Defendant never relayed that information to her electrician, however, who was hired to be present at the ceremony and ensure that all electricity-related issues ran smoothly. *See* Pls.' Statement at 28; Pls.' Br. in Opp'n ("Pls.' Opp'n"), Ex. D-1, Drew Dep. 36:9–19.[4]

C.     The Wedding

The wedding reception and ceremony were both held at Defendant's home on August 6, 2011. Chaim Kurzman, the band leader for Unanimous, was the first band member to arrive. *See* Def.'s Statement at ¶ 19. Upon arrival, Kurzman informed Defendant that the amount of electricity that her electrician laid out was insufficient, explaining that four circuits were needed to accommodate the needs of the band. *See* Def.'s Statement at ¶ 20; Def.'s Cert., Ex. S, Drew Dep. 24:8-11. After receiving that information, Defendant's electrician hastily rearranged the electrical configurations so that enough

---

[4] During the course of discovery, the electrician offered the following testimony:

Q. Had you – you said that you never saw any electrical specifications from Iris?
A. I did not get any electrical specifications.
Q. And Ms. Bernstein never told you, hey, there's some electrical specifications I got from the band planner?
A. No.
Q. Did she ever show you a printout with specifications on it?
A. No

electricity would be available.  *See* Def.'s Statement at ¶ 21; Def.'s Cert., Ex. S, Drew Dep. 24:13–25:22.

According to Defendant, the DJ and a female singer arrived shortly before the event was to begin.  *See* Def.'s Statement at ¶ 22.  Defendant recalls seeing only three performers—specifically, Kurzman, the DJ, and the female singer—on stage during the wedding reception, which would have violated the Agreement that required a total of six performers to appear.  *See id.* at ¶ 23; Def.'s Cert., Ex. J.  However, photographic stills from a wedding video produced by Defendant in discovery show that in addition to the three performers Defendant recalls, the stage was also occupied by a saxophonist, a guitarist, and a keyboardist.  *See* Pls.' Opp'n at 11, Exs. PH–1–PH–11; Pls.' Statement at 23.  Some of the stills also appear to show Defendant dancing in front of the stage with all six performers present.  *See, e.g.*, Pls.' Opp'n, Exs. PH, PH-1, PH-4.  Additionally, for the purposes of the instant motion, certain band members have submitted affidavits explaining that all six musicians were present during the reception.  *See* Pls.' Opp'n, Ex. A-1, Kurzman Aff. ¶ 6; Ex. A-2, V. Cuccia Aff. ¶ 6; Ex. A-3, L. Cuccia Aff. ¶ 6.[5]

According to Defendant, the band fell woefully short of matching the impressive ensembles showcased in IGMC's promotional materials.  *See* Def.'s Statement at ¶ 24.  At various points during the band's performance, Defendant expressed her dissatisfaction to the performers.  *See id.* at ¶ 25.  Ultimately, Defendant became convinced that the band was detracting from the tenor of the reception.  Accordingly, she instructed the band to cease playing, and substituted their music with her own iPod playlist.  *See id.*

D.    The Posting

Three days after the reception, on August 9, 2011, Defendant decided to post an online review of IGMC.  Defendant explained that she wished to write "'an honest posting' of opinion about the quality of services actually received."  *See id.* at ¶ 26 (quoting Def.'s Cert., Ex. A, Bernstein Dep. 81:13–14).  After perusing various websites for roughly twenty minutes, Defendant decided to post her review on a website called "Ripoff Report."[6] Defendant's review stated the following:

**iris gillon, igmc Way below Par service – did not get what was contracted for Internet**

iris gillon and igmc did not deliver acceptable service.  Iris is a marketeer par excellence – an unusually good salesperson with an impressive and well-

---

[5] The Court notes Defendant's objections to these affidavits.  *See* Def.'s Reply to Pls.' Resp. to Mot. for Summ. J. ("Def.'s Reply") 7, ECF No. 63.  Plaintiff is well within her legal rights to offer eye-witness accounts of relevant events in the form of affidavits to oppose the instant motion.  *See* Fed. R. Civ. P. 56(c)(4).  New Jersey rules require that such affidavits "shall be restricted to statements of fact within the personal knowledge of the signatory."  N.J. Loc. Civ. R. 7.2(a).  The Court will disregard any and all argument and legal conclusion contained in the affidavits, and will consider them only for the factual content to which each affiant could reasonably be called upon to testify.
[6] *See* http://www.ripoffreport.com/.

4

designed website. Don't let these things fool you. My son got married this past weekend and (1) the singer was awful (2) the number of musicians promised did not show up (3) the band leader had no personality whatsoever and though he tried hard to please, could not read the crowd. the band's electrical requirements that iris sent me were all wrong and my electrician, at an enormous additional expense, had to work the night of the party, in the rain, to make sure that there was enough power. also, notice how the rebuttals to the first complaint are from employees. i wonder why that is? I would never, ever recommend using this company.

Pls.' Opp'n, Ex. R-2. Two days after posting her review, Defendant sent Plaintiff a strongly worded e-mail further expressing her tremendous disappointment with IGMC's services. *See id*., Ex. E-1. In her e-mail, Defendant warned, "I plan to post my opinion in as many places online as i [*sic*] can find." *Id.*

    E.    <u>Plaintiffs' Lawsuit</u>

On August 3, 2012, Plaintiffs filed the instant action, which alleges that Defendant's August 9, 2011 posting was defamatory. In their initial filing, Plaintiffs alleged that the defamatory posting caused IGMC and Gillon professional and reputational harm, while also causing Gillon to suffer severe emotional trauma. *See* Compl. ¶¶ 59–72, Aug. 3, 2012, ECF No. 1. Based on those allegations, the complaint asserted the following causes of action:

    **Count I** – Libel;

    **Count II** – Libel *Per Se*;

    **Count III** – Libel *Innuendo*;

    **Count IV** – Injurious Falsehood;

    **Count V** – Defamatory Injury to Reputation;

    **Count VI** – Product Disparagement; and

    **Count VII** – False Light.[7]

*Id*. at ¶¶ 73–116.

On September 12, 2013, this Court issued an opinion and order granting in part and denying in part Defendant's motion to dismiss the amended complaint. *See* Op., ECF No. 16. The Court ruled that the posting largely contained non-actionable expressions of

---

[7] Plaintiffs later filed an amended complaint that included the seventh count for false light. Am. Compl. ¶¶ 176–82, Jan. 16, 2013, ECF No. 5.

opinion.  Consequently, any claims that related to those subjective statements were dismissed with prejudice.  *Id.* at 4.  However, it concluded that two of the posting's factual statements, in isolation, could form the basis of a defamation claim.  Those statements are the following:

> **The Musicians Statement**: "[T]he number of musicians promised did not show up[.]"

> **The Electricians Statement**: "The bands [sic] electrical requirements that Iris sent me were all wrong and my electrician, at an enormous additional expense, had to work the night of the party, in the rain, to make sure there was enough power."

*Id.* at 4–5.

With respect to the two factual statements described above, the Court dismissed certain counts without prejudice for failure to state a claim upon which relief could be granted.  *See id.* at 5–7.  Plaintiffs responded by submitting a second amended complaint, which included additional allegations relevant to the Musicians Statement and the Electricians Statement.  *See* Am. Compl. ("Second Am. Compl.") ¶¶ 83–90, Jan. 17, 2014, ECF. No. 21.  Rather than file a second motion to dismiss, Defendant decided to proceed with discovery.

After engaging in discovery, Defendant filed the instant motion for summary judgment.  Defendant argues that summary judgment is warranted because Plaintiffs are limited public figures, which means their claims can succeed only if Defendant acted with actual malice when posting her review.  *See* Def.'s Legal Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") 4–13, ECF No. 50.  Defendant further argues that even if Plaintiffs were purely private figures, they have not produced sufficient evidence demonstrating that the posting was made negligently.  *See id.* at 13–14.  Finally, Defendant offers other arguments for why she is entitled to summary judgment, including that the record is void of any evidence showing that Plaintiffs have suffered damages.  *See id.* at 14–25.  Plaintiffs oppose Defendant's motion.

## II.     LEGAL STANDARD

"A federal court sitting in diversity must apply state substantive law and federal procedural law." *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3rd Cir. 2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).  Federal Rule of Civil Procedure 56 provides for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party must support its position by citing to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] . . . admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court considers the record in the light most favorable to the non-moving party while drawing all reasonable inferences in that party's favor.  *Bowers v. NCAA*, 475 F.3d 524, 535 (3rd Cir. 2007).

## III.    DISCUSSION

As an initial matter, in its order on September 12, 2016, this Court noticed the parties that it intended to treat Counts I (libel), III (libel *innuendo*), and V (defamatory injury to reputation) as a single claim of libel due to the parties' failure to distinguish each individual cause of action.[8]  *See* Order 1, ECF No. 68.  Neither party has offered a compelling reason why these counts should not be consolidated and, therefore, the Court will collectively consider them as a single claim of libel.

In that same order, the Court raised the New Jersey Supreme Court's decision in *Dairy Stores, Inc. v. Sentinel Publ'g Co., Inc.*, 104 N.J. 125 (1986), and requested supplemental briefing from both parties to address the following issues: (1) whether the statements at issue impute to Plaintiffs fraud, dishonesty, or reprehensible conduct in relation to Plaintiffs' services; (2) whether, in light of *Dairy Stores, Inc.* and related authority, Counts I, III, and V seek to vindicate rights protected by the law of product disparagement, as opposed to defamation; and (3) assuming those counts do sound exclusively in product disparagement, whether Defendant is entitled to summary judgment on those counts.  *See* Order at 2.  The Court will first address whether Plaintiffs' claim for defamation overlaps with her claim for product disparagement before turning to the remaining counts.

---

[8] *Cf. Benton v. State*, 59 N.J.L. 551, 556 (1897) ("But the doctrine is well settled that, when the plain, natural meaning of the word is libelous, no innuendo is required.").

A.     Defamation vs. Product Disparagement

Under New Jersey law, "'[a] statement is defamatory if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him.'"  *W.J.A. v. D.A.*, 210 N.J. 229, 238 (2012) (quoting *Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152, 164–65 (1999)).  Libel is "defamation by written or printed words, or by the embodiment of the communication in some tangible or physical form . . . ."  *See id.*

New Jersey law also recognizes an action for product disparagement, sometimes referred to as trade libel, which is a statement consisting of four elements: (1) publication; (2) with malice; (3) of false allegations concerning plaintiff's property or product; and (4) causing special damages, *i.e.*, pecuniary harm.  *See Sys. Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1140 (3rd Cir. 1977); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 919 F. Supp. 756, 762 (D.N.J. 1996) ("In most contexts, 'trade libel' is essentially another name for the same cause of action.").

In juxtaposing defamation with product disparagement, the Supreme Court of New Jersey found the following:

> Although the two causes sometimes overlap, actions for defamation and product disparagement stem from different branches of tort law.  A defamation action, which encompasses libel and slander, affords a remedy for damage to one's reputation.  By comparison, an action for product disparagement is an offshoot of the cause of action for interference with contractual relations, such as sales to a prospective buyer.  The two causes may merge when a disparaging statement about a product reflects on the reputation of the business that made, distributed, or sold it.  If, for example, a statement about the poor quality of a product implies that the seller is fraudulent, then the statement may be actionable under both theories.  Courts generally are reluctant to impute a lack of integrity to a corporation merely from a criticism of its product.

*Dairy Stores*, 104 N.J. at 133–34 (citations omitted).  In a concurring opinion, Justice Garibaldi further expounded on the distinction:

> The elements of proof for product disparagement are much more stringent than those for defamation.  Therefore, courts generally have been reluctant to find that a disparaging statement that merely criticizes a product is also defamatory.  Defamation is found only where the imputation fairly implied is that the plaintiff is dishonest or lacking integrity, or that he is deliberately perpetrating fraud upon the public by selling a product which he knows to be defective.  Thus, unless the disparaging statement explicitly imputes to the corporation fraud, deceit, dishonesty, or

> reprehensible conduct in relation to the product, courts will not deem a merely critical statement to be defamatory.

*Id*. at 159 (Garibaldi, J., concurring) (citations and quotations omitted); *see also N.J. Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 408–09 (D.N.J. 1998) ("Additionally, the court again notes that statements charging personal misconduct or reprehensible personal characteristics at most are defamatory and are not actionable as product disparagement.") (internal quotations omitted); *Patel v. Soriano*, 369 N.J. Super. 192, 247–48 (App. Div. 2004) ("Interference by falsehoods that cause pecuniary loss, but are not personally defamatory, has been regarded as a tort more or less distinct from defamation.") (internal quotations omitted). For the purposes of this case, it is important to note that this distinction applies to corporations that provide services in addition to those that sell tangible goods. *See Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 377–79 (D.N.J. 2004) (distinguishing between defamation and product disparagement in a case involving a corporation that provided moving, shipping and storage services); *Coll. Sav. Bank*, 919 F. Supp. at 762 ("If the statement impugns a product *or service*, it will be treated as an injurious falsehood . . . .") (emphasis added).

Courts acknowledge that a single statement may simultaneously satisfy the elements of both defamation and product disparagement. *See Dairy Stores*, 104 N.J. at 133; *Patel*, 369 N.J. Super. at 248 ("Many statements effectuate both harms."). A claim for defamation will not survive, however, "unless the disparaging statement explicitly imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in relation to the product . . . ." *See Dairy Stores*, 104 N.J. at 159 (Garibaldi, J., concurring); *see also Sciarra*, 103 F. Supp. 2d at 409 (quoting *Dairy Stores*, 104 N.J. at 158–59 (Garibaldi, J., concurring opinion)); *Patel*, 369 N.J. Super. at 248 ("No personal defamation will be found where the most that can be made out of the words is a charge of ignorance or negligence.") (internal quotations omitted). Likewise, a claim for product disparagement will not survive where the statement only "casts aspersions on the reputation of an individual's reputation [*sic*], rather than his product or service . . . ." *See Coll. Sav. Bank*, 919 F. Supp. at 762.

With this distinction in mind, the critical question before the Court is whether the two remaining statements from Defendant's posting on August 9, 2011, impute to Plaintiffs "fraud, deceit, dishonesty, or reprehensible conduct" or whether the statements are merely critical of Plaintiffs' services. The Court will consider each in kind.

   1. The Musicians Statement

The Musicians Statement simply states that the number of musicians that were contracted to appear at the wedding did not actually appear. This statement suggests Plaintiffs' failure to fulfill their contractual obligations. At best, the statement imputes incompetence to Plaintiffs in their inability to provide wedding services; however, incompetence does not rise to the level of defamation. *See Patel*, 369 N.J. Super. at 248

("Some accusation of incompetence may be implied in imputations directed against a business or its product."). The statement does not suggest that Plaintiffs deceived Defendant or intentionally perpetrated some other harm by sending fewer musicians than were contractually required. *Cf. Dairy Stores*, 104 N.J. at 134–35 (finding that statement defamed plaintiff "by implying that it was trying to hide something"). It does not impute "fraud, deceit, dishonesty or reprehensible conduct" to Gillon as an individual or to her corporation. *See id*. at 159 (Garibaldi, J., concurring). The statement, therefore, sounds exclusively in product disparagement and cannot be considered defamatory because it only criticizes Plaintiffs' services. *See id*. at 134 ("Courts generally are reluctant to impute a lack of integrity to a corporation merely from a criticism of its product.").

### 2.    The Electricians Statement

The Electricians Statement states that Plaintiffs gave Defendant the wrong information concerning the electrical specifications required for the band's performance, which caused Defendant to incur additional expenses by having her electrician fix the problem. Similar to the Musicians Statement, this statement imputes incompetence to Plaintiffs' services, but it does not suggest that Plaintiffs intentionally provided the wrong specifications to perpetrate fraud, deceit or some other reprehensible behavior. It, therefore, sounds exclusively in product disparagement and cannot be considered defamatory because it only criticizes Plaintiffs' services. *See id*.

Accordingly, summary judgment is **GRANTED** for Defendant against Plaintiffs' defamation claim and Counts I, III and V are **DISMISSED**.

### B.    Product Disparagement and Injurious Falsehood

The Court now turns to the merits of Plaintiffs' product disparagement claim. At the outset, it is important to note that New Jersey law recognizes product disparagement as a cause of action emanating from the more general tort of injurious falsehood. *See Sys. Operations*, 555 F.2d at 1138 n.6 ("Product disparagement and slander of title are grouped together . . . under the more general term 'injurious falsehood,' . . . .") (internal citations omitted); *Coll. Sav. Bank*, 919 F. Supp. at 762 ("Trade libel and product [disparagement] lie within the general rubric of the tort injurious falsehood . . . .").

The Restatement (Second) of Torts defines injurious falsehood as:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

10

RESTATEMENT (SECOND) OF TORTS § 623A (1977).  Section 626 of the Restatement applies the same rules of liability "to the publication of matter disparaging the quality of another's land, chattels or intangible things . . . ."  *See id.* § 626.  In other words, product disparagement is another form of injurious falsehood that requires the same elements of proof, including a showing of malice and pecuniary harm.  *See Dairy Stores*, 104 N.J. at 161 n.3 (Garibaldi, J., concurring).  For this reason, the Court will consider Counts IV and VI as a single claim for product disparagement.  The Court will now address each of the four elements of Plaintiffs' claim to the two statements in question.

          1.     Publication

Both statements clearly satisfy the element of publication by virtue of the fact that Defendant posted them on the Ripoff Report website.  *See Mayflower Transit*, 314 F. Supp. 2d at 365, 378 (finding that publication prong had been met where statements in question were posted to the internet).

          2.     Malice

To satisfy the element of malice, "Plaintiff must demonstrate that Defendant's statements are false or that they were written with reckless disregard for the truth or falsity."  *See id.* (citing *Juliano v. ITT Corp.*, No. 90-cv-1575, 1991 WL 10023, at *5 (D.N.J. Jan. 22, 1991)).

Regarding the Musicians Statement, Plaintiffs produced at least two photographs purportedly showing six performers playing music with Defendant dancing directly in front of them.  Pls.' Opp'n, Ex. PH.  Plaintiffs also produced multiple photographs purportedly showing Defendant in close proximity to the performers that she claimed did not appear.  *Id.*, Exs. PH-1–PH11.[9]  Additionally, Plaintiffs produced three affidavits from band members who attended the wedding, claiming that all six performers appeared and were ready to perform as agreed upon.  *Id.*, Ex. A-1 at ¶ 6; A-2 at ¶ 6; A-3 at ¶ 6.  Viewing this evidence in the light most favorable to the non-moving party, the Court finds that a jury could reasonably decide that Defendant knew of or recklessly disregarded the fact that six performers appeared at the reception when she posted the Musicians Statement.

Regarding the Electricians Statement, it is undisputed that Plaintiffs provided Defendant with *some* electrical specifications in an email two days prior to the wedding. Pls.' Opp'n, Ex. E-6; Def.'s Cert., Ex. I  At his deposition, Defendant's electrician testified that Defendant never provided him with the specifications at any point prior to the wedding. Pls.' Opp'n, Ex. D-1, Drew Dep. 36:9–22.  Furthermore, apparently in reference to

---

[9] Defendant objects to the "never-before produced narrative photographs" as lacking authenticity, but Plaintiffs are not required to produce evidence at summary judgment in the same manner as they will at trial.  *See Celotex Corp.*, 477 U.S. at 324.  Furthermore, Plaintiffs claim that the photographs are stills from a video of the wedding produced by Defendant in discovery, which, if true, would render Defendant's objection disingenuous.  Pls.' Opp'n at 11.

Plaintiffs' email, he testified that "[f]our [amp lines] was adequate to cover the needs, it worked."[10]  *See id.*, Ex. D-1 at 34:5–9.  At her own deposition, Defendant testified that she could not remember whether she forwarded the specifications to her electrician and she admitted that she had "no idea" what the specifications meant.  *See* Def.'s Cert., Ex. A, Bernstein Dep., 88:19–89:25; 93:15–94:16.  Finally, the band leader stated in his affidavit that he confirmed the correct specifications to Defendant's wedding planner on a conference call prior to the wedding and that those specifications were the exact same ones communicated in Plaintiffs' email.  Pls.' Opp'n, Ex. A-1 at ¶ 8.  It is clear, therefore, that Defendant did not know whether the specifications she received were in fact wrong and a jury could reasonably find that, at a minimum, she recklessly disregarded the truth when she posted the Electricians Statement.  The malice element is satisfied for both statements.

### 3.    False Allegations Concerning Plaintiffs' Services

Plaintiffs have satisfied the falsity element of both statements.  Concerning the Musicians Statement, Plaintiffs' exhibits clearly show that six performers attended the wedding and performed.  *See* Pls.' Opp'n, Ex. PH–PH-11.  Concerning the Electricians Statement, both the electrician and the band leader declared that the specifications in Plaintiffs' email adequately met the needs of the band.  *See id.*, Exs. A-1 at ¶ 8; D-1 at 34:5–9.  Viewing the evidence in the light most favorable to the non-moving party, the falsity element is satisfied for both statements.

### 4.    Special Damages

Unlike in the defamation context where damages are presumed, Plaintiffs must show special damages directly caused by the statements in question to complete their product disparagement claim.  *See Sys. Operations*, 555 F.2d at 1140 ("'The action requires special damages in all cases, unlike defamation.'") (quoting *Henry V. Vaccaro Constr. Co. v. A.J. DePace, Inc.*, 137 N.J. Super. 512, 517 (Law Div. 1975)).  The Supreme Court of New Jersey defines special damages as a subcategory of actual or compensatory damages that "compensate a plaintiff for specific economic or pecuniary loss."  *See Nuwave Inv. Corp. v. Hyman Beck & Co., Inc.*, 221 N.J. 495, 499 (2015) (citations omitted).  To show special damages, Plaintiff must "allege either loss of particular customers by name, or a general diminution of business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication."  *See Bocobo v. Radiology Consultants of S. Jersey, P.A.*, 477 Fed. App'x 890, 901 (3rd Cir. 2012) (internal quotations omitted).

In their second amended complaint, Plaintiffs appear to allege damages based on the loss of one customer and on the general diminution of IGMC's business.  *See* Second Am. Compl. at ¶¶ 112–24.  With respect to the lost customer, Plaintiffs allege that an

---

[10] The excerpts from the deposition transcript provided by Plaintiff do not confirm what the deponent is referring to, but it seems clear from the context that he is referring to the 20 amp lines in Plaintiffs' email.

individual canceled a contract with IGMC due to Defendant's posting and Plaintiffs were forced to issue a refund of $3,700.00.  *See id.* at ¶ 121.  At summary judgment, Plaintiffs submitted a document which they claim is a voided contract related to that lost customer. *See* Pls.' Opp'n, Ex. C-5.  The document shows a contract with IGMC to provide for the performance of the band "Essence" in return for a $7,400.00 fee and a holding deposit of $3,700.00; however, for reasons unknown to the Court, the names of the other contracting parties are redacted.  *Id.*  The document, therefore, does not satisfy the requirement that Plaintiffs allege the "loss of particular customers by name . . . ."  *See Bocobo*, 477 Fed. App'x at 901; *Graco Inc. v. PMC Global, Inc.*, No. 08-cv-1304, 2012 WL 762448, at *15 (D.N.J. Mar. 6, 2012) (dismissing Plaintiff's trade libel claim because it failed to identify specific lost customers).

The remaining damages claims, with the exception of emotional damages, fall under general diminution of business.[11]  When predicating a damages claim on the general diminution of business, Plaintiff must provide "'facts showing an established business, the amount of sales for a substantial period preceding publication, the amount of sales for a [period] subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom.'"  *See Mayflower Transit*, 314 F. Supp. 2d at 378 (quoting *Juliano v. ITT Corp.*, No. 90-cv-1575, 1991 WL 10023, at *6 (D.N.J. Jan. 22, 1991)).  Importantly for the instant motion, Plaintiffs must show that their general loss of business "was a *direct* result of Defendant['s] purportedly [disparaging] statements."  *See Bocobo*, 477 Fed. App'x at 901 (emphasis original) (dismissing plaintiff's trade libel claim, in part, for failure to show that difference in salary was a direct result of defendants' statements); *Mayflower Transit*, 314 F. Supp. 2d at 378–79 (denying summary judgment for plaintiff where it failed to show that its loss was directly caused by defendant's statements).

Plaintiffs produced portions of tax returns from 2005 through 2011, showing IGMC's gross income for those years but with all other information redacted from the documents, apparently because Plaintiffs want the Court to focus only on gross income.[12] *See* Pls.' Opp'n, Ex. T-1.  Defendant submitted more reliable versions of IGMC's tax returns from 2007 through 2013.  *See* Def.'s Cert., Ex. W.  While these documents show a substantial drop in IGMC's gross income between 2010, the last full year before Defendant's posting, and 2012, the first full year after Defendant's posting, they do not conclusively establish a diminution of business directly caused by Defendant's statements. *See id.*  Gross income is not the only relevant figure to diminution.  Expenses, net income and other figures might provide further insight into the fluctuation of a company's dealings

---

[11] "[P]ersonal elements of damages, such as mental distress, are strictly excluded" in a product disparagement claim. *See Patel*, 369 N.J. Super. at 249.

[12] Plaintiffs also apparently produced similar documents for 2012, 2013 and 2014 in an exhibit labeled "Separate Tax Exhibits."  After thoroughly searching Plaintiffs' briefing papers and the rest of the docket, the Court is unable to locate this exhibit and, therefore, cannot consider it.

from year to year, which might provide alternative explanations as to why IGMC's business diminished. As noted above, IGMC's net income fluctuated greatly from year to year, even before Defendant posted her statements. *See supra* Part I.A.

Plaintiffs also produced a so-called "expert opinion letter" from Shane McMurray ("McMurray Opinion" or "Opinion"), the CEO and founder of a company called The Wedding Report, Inc. *See* Pls.' Opp'n, Ex. A-7. In the Opinion, Mr. McMurray concludes that "the prominence of the Bernstein posting has caused and will continue to cause significant injury to IGMC's business, in the amount of $250,000-$300,000 gross collected commissions on band and catering sales, and a personal income loss for Iris Gillon after re-investing her commissions into her company of $100,000-$110,000 [per] [*sic*] year." *See id.* at 1. Plaintiffs offer Mr. McMurray as an expert in the wedding industry who "is ideally positioned to detangle any change in the economy from the drop in Ms. Gillon's business." *See* Pls.' Opp'n at 32. In other words, Mr. McMurray possesses the requisite knowledge and economic expertise to conclusively establish that Defendant's statements caused the diminution of IGMC's business and to exclude all other possible causes, including macroeconomic conditions, that might generally impact Plaintiffs' business. Mr. McMurray apparently provided a *curriculum vitae* and over 300 pages of other reports in support of his Opinion, but Plaintiffs failed to submit any of these documents. *See* Pls.' Opp'n at 32–33, Ex. A-7. Nevertheless, Plaintiffs moved this Court to admit the McMurray Opinion as an expert opinion. Pls.' Opp'n at 32–33.

"Federal courts apply the federal rules for procedure and evidence when sitting in diversity." *Vaccaro v. HJC Am., Inc.*, No. 04-cv-3480, 2007 WL 2990759, at *2 (D.N.J. Oct. 9, 2007) (citing *Chamberlain*, 210 F.3d at 158). The Third Circuit has held that the Federal Rules of Evidence are procedural in nature and apply to diversity cases. *See Salas by Salas v. Wang*, 846 F.2d 897, 903–906 (3rd Cir. 1988). The Court will, therefore, consider the McMurray Opinion pursuant to the federal rules governing expert testimony.

Rule 702 provides that an expert witness's testimony is admissible if: "(a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "The Rule . . . 'establishes a standard of evidentiary reliability.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)). In assessing the reliability of an expert's opinion, "the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'" *See In re Urethane Antitrust Litig.*, 152 F. Supp. 3d 357, 360 (D.N.J. 2016) (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145–46 (3rd Cir. 2000)). "The proponent of expert evidence must demonstrate its admissibility by a preponderance of the evidence." *Id.* (citing *Daubert*, 509 U.S. at 593 n.10). Plaintiffs, therefore, must demonstrate the admissibility of the McMurray Opinion by a preponderance of the evidence. *See id.*

14

Plaintiffs ostensibly offer the McMurray Opinion as an expert opinion on the economic damages caused by Defendant's statements, in support of their business diminution claim. Unfortunately for Plaintiffs, however, they have failed to provide any indicia of reliability regarding the Opinion. Plaintiffs failed to provide any information addressing Mr. McMurray's educational or professional background, which could support his qualifications as an economics and wedding industry expert. The Opinion states that Mr. McMurray is the CEO of a company that "collects and publishes detailed statistics on spending in the wedding industry," but it provides no information as to how the statistics are compiled and analyzed, or how Mr. McMurray's experience qualifies him to opine on the deleterious effect of negative internet postings to businesses. *See* Pls.' Opp'n, Ex. A-7 at 1. Mr. McMurray states that "[t]he basis for my opinion is my familiarity with these reports," and that "[t]he methodology of our data collection is explained in our report." As stated above, however, Plaintiffs failed to provide even a single page of these reports.

Concerning the methodology employed to assess IGMC's business, Mr. McMurray states that he "reviewed IGMC's Profit & Loss statements for years 2007-13 and a summary of her Band and Catering sales since 2004." *See id*. He also "viewed the defamatory posting on the Ripoff Report website and the listing of this posting in the top 5 of Google results for IGMC." *See id*. The Opinion provides no explanation as to *how* Mr. McMurray applied this information to reach his conclusions. The Opinion also states that the decreases in IGMC's business "cannot be accounted for by changes in the wedding industry, either nationally or locally. Nor by changes in these sub-areas of wedding spending, which were stable as shown in the attached Wedding Industry Report [*sic*]." This conclusion is apparently supported by statistics in another report not provided to the Court, and it fails to explain which "sub-areas" it refers to and what their relevance might be. *See id*. Likewise, the Opinion asserts that "[i]nternet research is increasingly central to couples," citing statistics purportedly showing an increase in internet usage to plan weddings and a supposedly correlated increase in wedding spending. Again, the Opinion provides no explanation as to how these statistics are intrinsically linked or from which unattached report they emanate. *See id*. Finally, the Opinion concludes that "[a] single negative report that appears prominently in Google Search will cause couples to bypass that vendor to seek another." *See id*. This statement is unsupported.

In sum, Plaintiffs fall woefully short in demonstrating to the Court how the McMurray Opinion is reliable pursuant to Rule 702 because they failed to show how it "is based on valid reasoning and reliable methodology." *See* Fed. R. Evid. 702; *Urethane Antitrust Litig.*, 152 F. Supp. 3d at 360; *see also Krys v. Aaron*, 112 F. Supp. 3d 181, 189 (D.N.J. 2015) ("The reliability restriction requires that the testimony be based upon the methods and procedures . . . rather than on subjective belief or unsupported speculation and that the expert have good grounds for his or her belief.") (internal quotations omitted). The Court denies Plaintiffs' request to admit the McMurray Opinion. Consequently, Plaintiffs cannot show that the diminution of IGMC's business was directly caused by

Defendant's statements and has failed to show special damages. Thus, Plaintiffs' product disparagement claim must fail. *See Bocobo*, 477 Fed. App'x at 901; *Mayflower Transit*, 314 F. Supp. 2d at 378–79.

Accordingly, summary judgment is **GRANTED** for Defendant against Plaintiffs and Counts IV and VI are **DISMISSED**.[13]

C.      Libel *Per Se*

The Court now turns to Plaintiffs' claim of libel *per se* (Count II).  The Supreme Court of New Jersey acknowledges the term libel *per se* as a writing that is defamatory on its face, which is distinguished from a writing that is defamatory solely in light of extrinsic facts (libel *per quod*).  *See Lawrence v. Bauer Publ'g & Printing Ltd.*, 89 N.J. 451, 459 (1982) (citing *Herrmann v. Newark Morning Ledger Co.*, 48 N.J. Super. 420, 443 (App. Div. 1958)).  "A determination of whether certain language is defamatory on its face rests within the power of the trial court."  *Id*. (citing *Leers v. Green*, 24 N.J. 239, 255 (1957)).  "Only when the court finds the words to be capable of both a defamatory and a nondefamatory meaning does a question of fact arise for the jury to decide."  *Id*. (citing *Herrmann*, 48 N.J. Super. at 430).

As a point of clarification, the Court finds that the state and federal case law, on balance, supports a differentiation between the doctrines of libel *per se* and slander *per se*.  *See, e.g., Ciemniecki v. Parker McCay P.A.*, No. 09-cv-6450, 2010 WL 2326209, at *10 (D.N.J. June 7, 2010) ("As an initial matter, this argument appears to confuse two distinct concepts in defamation law, namely "defamation per se" and "slander per se.").  As such, the critical inquiry under the libel *per se* doctrine is not whether the statements in question fit into one of the four traditional categories of slander *per se*.[14]  Rather, the critical inquiry is whether the statement in question is defamatory on its face and, therefore, actionable without further factual support; or whether the statement requires extrinsic facts to establish its defamatory nature.  *See Lawrence*, 89 N.J. at 459; *Biondi v. Nassimos*, 300 N.J. Super. 148, 153 n.2 (App. Div. 1997) ("The term 'defamation per se' refers to a statement whose defamatory meaning is so clear on its face that the court is not required to submit the issue to the jury.") (citation omitted); *see also Shaw v. Bender*, 90 N.J.L. 147, 149 (N.J. 1917) ("Whenever words clearly sound to the disreputation of the plaintiff, there is no need of further proof; they are defamatory on their face and actionable per se.") (internal quotation omitted).

---

[13] Regarding the voided contract, the Court notes that Plaintiffs may have a viable claim for product disparagement in state court, provided that they can properly identify the other contracting parties.  The action cannot continue in this Court, however, because it fails to meet the $75,000.00 threshold amount required for this Court to exercise supplemental jurisdiction. 28 U.S.C. §§ 1332(a), 1367(c)(3).

[14] The four recognized categories of slander *per se* are "statements that impute (1) commission of a crime, (2) contraction of a loathsome disease, (3) occupational incompetence or misconduct, and (4) unchastity of a woman." *See Ward v. Zelikovsky*, 136 N.J. 516, 526 (1994) (citing *Gnapinsky v. Goldyn*, 23 N.J. 243, 250–51 (1957)).

The Court's previous analysis of defamation and product disparagement is helpful here. The defamatory nature of both the Musicians and Electricians Statements is contingent upon whether the facts asserted therein were actually false. *See W.J.A.*, 210 N.J. at 238 ("[A] statement is defamatory if it is false . . . ."). As noted above, the falsity element is satisfied for the purposes of summary judgment; however, both statements require extrinsic facts to prove their falsity. *See supra* Part III.B.2–3. Furthermore, the Court's determination that the statements sound exclusively in product disparagement instead of defamation warrants consideration here. *See supra* Part III.A. It stands to reason that if the statements are not libelous because they do not explicitly impute to the corporation "fraud, deceit, dishonesty, or reprehensible conduct in relation to the product," then those same statements are also not libelous *per se*. *See Dairy Stores*, 104 N.J. at 159 (Garibaldi, J., concurring); *Biondi*, 300 N.J. Super. at 153 n.10. Indeed, both the Musicians and Electricians Statements are capable of defamatory and nondefamatory interpretations by virtue of the fact that their purported defamatory nature is contingent upon knowledge of extrinsic facts. Consequently, neither statement can meet the definition of libel *per se* because neither is defamatory on its face. *See Lawrence*, 89 N.J. at 459; *see also Schiavone Constr. Co. v. Time, Inc.*, 619 F. Supp. 684, 694 (D.N.J. 1985) (construing defamation *per se* as a statement "that is not reasonably susceptible of a nondefamatory interpretation").

Accordingly, summary judgment is **GRANTED** for Defendant against Plaintiffs' libel *per se* claim and Count II is **DISMISSED**.

D.  <u>False Light</u>

The Court now turns to Plaintiffs' final count of false light (Count VII). Under New Jersey law, false light is a cause of action arising out of the greater tort of invasion of privacy. *See Romaine v. Kallinger*, 109 N.J. 282, 293 (1988). The law closely follows the Restatement (Second) definition:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light which the other would be placed.

RESTATEMENT (SECOND) OF TORTS § 652E; *see Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761, 766 (D.N.J. 1981). The Court has already decided the second prong, actual malice, in Plaintiffs' favor. *See supra* Part III.B.2; *see also Durando v. Nutley Sun*, 209 N.J. 235, 249 (2012) ("The second prong of a false-light claim parallels the requirements of the actual-malice standard . . . ."). Consequently, the only question remaining is whether a jury could reasonably find that the Musicians and Electricians Statements "would be highly offensive to a reasonable person."

17

False light and defamation are "closely allied, and the same considerations apply to each." *See Cibenko*, 510 F. Supp. at 766. A statement does not have to be defamatory, however, to be actionable under false light. *See id*. The statement in question need only be highly offensive to a reasonable person; in other words, "[t]he publicized material in a false-light claim must constitute a major misrepresentation of [plaintiff's] character, history, activities or beliefs." *See Romaine*, 109 N.J. at 295. "Thus, it is for the Court to determine whether the communication in question is capable of bearing a particular meaning which is highly offensive to a reasonable person." *Cibenko*, 510 F. Supp. at 766.

Given that false light and defamation are "closely allied," the Court's previous distinction between defamation and product disparagement warrants consideration here. *See supra* Part III.A. As stated before, both the Musicians and Electricians Statements criticize the services Plaintiffs provided to Defendant, but they do not impute to Plaintiffs "fraud, deceit, dishonesty, or reprehensible conduct." Consequently, the statements are actionable under product disparagement but not under defamation. *Id*. For the same reason, the Court finds that these statements do not rise to the level of what a reasonable person would consider to be "highly offensive." *See Cibenko*, 510 F. Supp. at 766; *cf. Dairy Stores*, 104 N.J. at 159 (Garibaldi, J., concurring) ("Thus, unless the disparaging statement explicitly imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in relation to the product, courts will not deem a merely critical statement to be defamatory.").

As a practical matter, Plaintiffs conduct the majority of their business over the internet. *See* Pls.' Opp'n, Ex. D-3, Gillon Dep. 11:2–14. As such, they avail themselves to the public in that forum and cannot reasonably expect protection from criticism of their business dealings under an invasion of privacy tort. Furthermore, the Restatement notes that "[t]he right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded. . . . A corporation . . . has no personal right of privacy." *See* Restatement (Second) of Torts § 652I cmts. a, c. As a result, IGMC has no cause of action under false light. *Id*.

Gillon, on the other hand, could maintain a cause of action if the statements against her constituted "a major misrepresentation of [her] character, history, activities or beliefs." *See Romaine*, 109 N.J. at 295. Mere criticisms of her services, however, do not rise to that level. *Cf. Savely v. MTV Music Television*, No. 11-cv-1021, 2011 WL 2923691, at *5 (D.N.J. July 18, 2011) (finding that plaintiff appropriately alleged false light claim because statement associated him with a provocative and profane artist, which hurt his business); *Ciemniecki*, No. 09-cv-6450, 2010 WL 2326209, at *14 (D.N.J. June 7, 2010) (finding that plaintiff appropriately alleged false light claim because statement accused her of raising a false fire alarm, which is generally regarded as a rather despicable act); *Gibbs v. Massey*, No. 07-cv-3604, 2009 WL 838138, at *12 (D.N.J. 2009) (finding that plaintiff appropriately alleged false light claim because statement accusing her of theft qualified as

highly offensive).  False criticisms of a business's products or services are appropriately couched under the product disparagement cause of action, not under false light.  *Cf. Dairy Stores*, 104 N.J. at 134 ("Courts generally are reluctant to impute a lack of integrity to a corporation merely from a criticism of its product.").

Accordingly, summary judgment is **GRANTED** for Defendant against Plaintiffs' false light claim and Count VII is **DISMISSED**.

## IV.    CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is **GRANTED** in its entirety and all counts are **DISMISSED**.


                                                    */s/ William J. Martini*
                                                **WILLIAM J. MARTINI, U.S.D.J.**

**Date: November 3, 2016**